## Case No. 5,699.

### GRANT v. MAXWELL

[2 Blatchf. 220;[1] 26 Hunt, Mer. Mag. 60.]

Circuit Court S. D. New York. June 2, 1851.

CUSTOMS—DEPRECIATED FOREIGN CURRENCY—VALUE OF IMPORTS IN.

1. The proviso to the 61st section of the act of March 2, 1799 (1 Stat. 673), which declares "that it shall be lawful for the president of the United States to cause to be established fit and proper regulations for estimating the duties on goods, wares and merchandise imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency issued and circulated under authority of any foreign government," is not repealed by the act of May 22, 1846 (9 Stat. 14), which prescribes the rates at which certain foreign coins shall be estimated in computations at the custom-house.

[Cited in Dutilh v. Maxwell, Case No. 4,-207.]

2. Notwithstanding the act of May 22, 1846, an importer of foreign goods is entitled, under the proviso to the 61st section of the act of 1799 and the treasury instructions issued for carrying the same into effect, to enter his goods on paying duties only upon their cash value in the country of their purchase; and is entitled, in order to fix that value, to have the paper or nominal value at which they were purchased and invoiced, reduced to its specie value in such country at the time of the purchase, and to enter the goods on that valuation.

3. Where goods were purchased in Austria, in 1850, and imported into New-York, and the invoice and entry set forth the purchase price in paper florins, and they were paid for in paper currency, and it appeared that the paper florin was depreciated in Austria, at the date of the purchase of the goods, below the value of the silver florin, although it was the legal currency in Austria, and was a legal tender at its nominal value: *Held* that, although the act of May 22, 1846, directed the florin of the Austrian empire to be estimated at forty-eight and one-half cents, yet, under the proviso to the 61st section of the act of 1799, and the treasury instructions in regard to invoices made out in a foreign depreciated currency, the goods were chargeable with duty only on their value in silver florins, after allowing for the depreciation.

[Cited in Fiedler v. Maxwell, Case No. 4,760.]
[See Alsop v. Maxwell, Case No. 263.]

This was an action against [Hugh Maxwell] the collector of the port of New York, to re-

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

cover back an excess of duties paid on goods purchased in Austria on two different days in May, 1850, and shipped from Trieste to New York. The invoice and entry set forth the purchase-price of the goods in paper florins, and they were paid for in paper currency. It appeared upon the trial, by oral testimony, and also by the official certificate of the United States consul at Trieste, that the paper florin was depreciated in Austria, at the two several dates of the purchase of the goods, 18¼ and 19⅝ per cent. below the value of the silver florin. It was further proved, that the legal currency in Austria at those dates was paper money, estimated in florins, and made by law a legal tender at its nominal value. The plaintiff [Samuel Grant] claimed, that the duty on the goods should be paid upon their value in silver florins. A verdict was taken for the plaintiff, subject to the opinion of the court on a case to be made. .

John S. McCulloh. for plaintiff.
J. Prescott Hall, Dist. Atty., for defendant.

BETTS, District Judge. By the act of congress of the 22d of May, 1846 (9 Stat. 14), it is enacted that, in all computations at the custom-house, the foreign coins and money of account therein specified, shall be estimated at certain specified rates, and, among others, "the florin of the Austrian Empire and of the city of Augsburg, at forty-eight and one-half cents." The act also declares, that all laws inconsistent with it are thereby repealed. For the defendant it is urged, that he was bound, by the terms of the act, in charging duties on the goods in question, to rate the florin of the invoice at forty-eight and a half cents, without regard to its specie value or depreciation. The plaintiff, on the other hand, claims that the goods are subject to duty only upon their cash value abroad, and that he is entitled, in order to fix that value, to have the paper or nominal value at which they were purchased and invoiced, reduced to its specie value in Austria, and to enter the goods on that valuation.

The purpose of the government, in all its laws imposing ad valorem duties on foreign merchandise imported into this country, has been to take the true value of the goods in the country which produced them or in which they were obtained, ascertained by the actual purchase price or by their market value, as the basis upon which such duties are to be computed. This is manifested in the various revenue laws introducing from time to time new provisions to enable the collectors to fix the foreign value correctly and to render duties uniform. The oaths exacted to invoices and on entries, and the enlarged powers conferred on appraisers, together with the early regulation by law of the value of foreign currencies, with the methods of determining their depreciation, are all designed to accomplish that end. The enactments for this purpose are found in the acts of July 4, 1789; August 10,

1790; March 2, 1799; March 3, 1801; March 1, 1823; May 19, 1828; July 14, 1832; August 30, 1842; and July 30, 1846. 1 Stat. 24, 180, 627; 2 Stat. 121; 3 Stat. 729; 4 Stat. 270, 583; 5 Stat. 548; 9 Stat. 42. The invoice value of merchandize must be expressed in money, and the invoice and entry must particularly specify in what money the goods are bought and valued. Act March 2, 1799 (1 Stat. 655, § 36). And they must be invoiced in the currency of the country whence they are imported, without respect to the intrinsic value of the money or the standard of the United States fixed for its value. Act March 3, 1801 (2 Stat. 121, § 2). Still, the actual wholesale cash value is to be ascertained and made the dutiable basis, notwithstanding any affidavit or invoice statement or valuation. Act Aug. 30, 1842 (5 Stat. 563, § 16).

The earlier and later enactments concur in enforcing the one prominent object, that of having at the custom-house the actual value in cash of the merchandise imported, at the place of its exportation. To make that purpose effectual, in addition to the regulations respecting invoices, entries and appraisals, congress, by the 61st section of the act of March 2, 1799 (1 Stat. 673), fixed the rates at which all foreign coins and currencies should be estimated in the United States, giving to various known denominations of foreign money a specific value, and requiring all other denominations to be estimated in value, as nearly as might be, to such fixed rates or the intrinsic value thereof, compared with money of the United States. The following proviso was added to the section: "That it shall be lawful for the president of the United States to cause to be established fit and proper regulations for estimating the duties on goods, wares and merchandise imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency issued and circulated under authority of any foreign government."

The main question submitted to the court for its decision in this case is, whether the act of 1846 covers the whole subject, so that the cost price of the goods must be estimated at forty-eight and a half cents to the florin stated in the invoice or whether the proviso to the 61st section of the act of March 2, 1799, operates in the case, and entitles the plaintiff to enter his goods on paying duties upon the specie or intrinsic value of the Austrian florin or currency. The act of March 2, 1799, is regarded as the fundamental law in relation to imposts and duties, and each of its enactments is viewed as independent, forming a rule upon the particular subject which is not changed by subsequent legislation varying other provisions of the act. The like doctrine applies to the succession of statutes which have followed the parent act. Accordingly, the law of imposts and duties is enforced as a system composed of distinct enactments, passed at various periods of time, and each provision is executed as part of the system, notwithstanding

the change or repeal of other provisions in the same statute in relation to the denomination of imports or the rates of duties or the methods of computing them. This is sometimes effected by virtue of a saving clause appended to the new act (Act July 14, 1832; 4 Stat. 583, § 1); and sometimes by declaring all provisions of any former law inconsistent with the act last passed to be repealed (Act Aug. 30, 1842; 5 Stat. 566, § 26; Act July 30, 1846; 9 Stat. 44, § 11); and, again, by the decisions of the courts on the effect of subsequent enactments. Anterior to the passage of the act of May 22, 1846, the treasury department had treated the proviso to the 61st section of the act of March 2, 1799, as continuing in force, and duties were levied in conformity to its provisions. Treasury Instructions to Collectors, May 14, 1831; Id. Oct. 16, 1832; Id. April 4, 1840; Id. Aug. 20, 1845. The latest instructions from the secretary of the treasury, dated October 12, 1849, direct that bonds taken for the production of consular certificates of the value of depreciated currencies must be strictly enforced; which imports the continuing operation of the proviso, in the judgment and practice of the executive department, because the consular certificates come into existence and have validity solely under the powers given by that proviso. The 61st section of the act of March 2, 1799, fixed the value of certain foreign coins or currencies. So, subsequently, did the 1st section of the act of March 3, 1801 (2 Stat. 121); and similar provisions were re-enacted in the act of June 28, 1834 (4 Stat. 700), in the act of March 3, 1843 (5 Stat. 625), and in the act of May 22, 1846 (9 Stat. 14), the last two acts being framed in like terms, and declaring that all laws inconsistent therewith are thereby repealed.

It is plain, upon this summary statement of the course of legislation and practice on the subject, that the proviso to the 61st section of the act of March 2, 1799, is to be regarded as repealed only in the contingency that it stands opposed to subsequent acts of congress, and especially to the act of May 22, 1846. The reason for its preservation and enforcement, as a means to secure importers against the payment of ad valorem duties on amounts beyond the fair value of the merchandise imported, is the same at the present time as when it was enacted. What, then, does the proviso require? Clearly, not a disregard of the valuation of foreign currency designated by statute; but only a method of determining whether that assumed value remains unchanged, and whether the actual value corresponds with the nominal rate. The invoice must be expressed in the currency of the country from which the goods are exported or in which they are produced. The nominal currency will necessarily very often give the cost or market value very wide of the true value. In the case before the court, it is proved beyond question that the goods imported are rated nearly twenty per cent. above their actual value in Austria,

and beyond their real cost to the importer. This disaccordance is forced on him by the imperative direction of the revenue laws. He must invoice the goods at the cost or value expressed in the currency of Austria, although they are obtained at one-fifth less than that amount in specie, and, without the aid of the proviso, he will be precluded from showing the actual cost or value.

It seems to us that the proviso does not in any way contradict the statute of 1846. It supplies the custom-house with a means of levying duties on invoices in conformity with the general provisions and scope of the revenue laws, and helps to carry out the intention of congress, by keeping the fluctuations of nominal values to the standard of specie values, in transactions in foreign currencies. Congress does not make the foreign currencies named in the statute receivable in the United States at the values affixed to them. Had that been so, the merchant might be considered as protected by the opportunity of paying duties in the currency of his invoices. The proviso looks to a remedy for the injury that might, without its aid, be sustained by importers under a statutory regulation of foreign coins and currencies, bringing them in accord with United States currency, and yet leaving their nominal rates to act as a measure of value of merchandize in the country where it is purchased.

We think that there is no incompatibility or inconsistency between the acts subsequent to the act of 1799 upon this subject and the proviso, and that accordingly, neither by the terms of the act of 1846 or of those antecedent to it, nor by legal implication, is the proviso to the 61st section of the act of 1799 repealed or its legal operation suspended. The business of the country was conducted on that understanding of the law antecedently to 1846, and collectors and the treasury department unitedly admitted importations and charged duties in conformity with regulations adopted by authority of the proviso. The proviso was repugnant to the enacting clause of the 61st section of the act of 1799, precisely as it is to a like designation of the value of foreign currencies by the act of 1846. That section, in nearly identical language, declared the value of various denominations of foreign moneys; but the proviso, referring to the depreciation of foreign currencies in which the original cost of goods was exhibited, would necessarily include those specified in the enacting clause, equally with those not named. There was no less necessity for the interposition of the president in relief of the merchant, when his invoices were made up in a currency which had depreciated after its valuation had been once determined by congress, than where no rate of valuation had been established by law. The proviso is accordingly framed to apply to all importations, when the invoice is exhibited in a depreciated currency issued and circulated under the author-

ity of a foreign government, and necessarily embraces equally those currencies whose value has been once fixed by congress, and those which have never been recognized by our laws. The treasury circular of August 20, 1845, regards the proviso as in the alternative. Its directions relate to invoices made out in a foreign depreciated currency, or in a currency the value of which is not fixed by the laws of the United States.

This is, we think, the correct reading and exposition of the proviso to the 61st section of the act of 1799. Congress has since, from time to time, ascertained the existing value of various foreign coins and currencies, and declared them by statute. This relieved the treasury department from keeping on foot a train of investigations, at every importation, respecting the value of the currency in which the invoice was exhibited. The statute value was adopted as the real one, for the time being. But it was manifest that such valuations must be liable to change, from the adulteration of coins or the emission of paper or base currencies abroad; and it was consonant with the general course of legislation in relation to the revenue, that a means should be supplied the executive department to maintain uniformity in imposts and duties, without delaying the business of the country or enforcing hardships or inequalities upon importers until special legislation could be interposed to remove the difficulty. The proviso supplied such means; and, as its operation was so appropriate, as well as effectual and just, we must conclude it to have been the purpose of congress to retain it in force, when they have not in express terms rescinded it or passed any enactment necessarily repugnant to it. On the contrary, it seems to us that, as the proviso is essentially prospective, and contemplates a state of things which may come into existence at a future period, the act of May 22, 1846, instead of being construed as repealing it, ought to be understood as upholding and sanctioning the powers conferred by it on the president. Judgment must, therefore, be entered for the plaintiff, on the verdict.